The next case this morning is 522-0088, People v. Williams. Arguing for the defendant appellant is Elizabeth Cook. Arguing for the state appellee is Hiram Fenjack. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please know that the clerk is permitted to record these proceedings today. Good morning, counsel. I apologize, our last two cases took a little longer than we expected, so we appreciate your patience. Ms. Cook, are you ready to proceed? I am, thank you, your honor. Go right ahead. May it please the court. I would like to focus this morning on the first three arguments. The first two relate to Calvin's request for a new trial, and the third relates to his request for a remand for further crank up receivings. Calvin Williams did not receive a fair trial. The all deprived Calvin of his right to present a defense and have the jury consider only competent evidence. Calvin's one-time friend and confidant, Paula Moore, was allowed to present inflammatory and unreliable hearsay testimony over repeated objections by defense counsel. The state has conceded that Moore's testimony included inadmissible hearsay. Moore told the jury that the victim, Gerriante Brown, did not own a gun and that she told Calvin the same. This evidence served to discredit Calvin's ultimate defense, which was that he believed, either reasonably or not, that Gerriante was armed and a threat to him. In addition, Moore's hearsay evidence suggested a motive for the shooting when she stated that Gerriante and Calvin had had a dispute over missing money and that, in consequence, Gerriante had received videos from Calvin that he perceived as threatening. Moore's testimony concerned matters of which she had no firsthand knowledge because she was not present during the dispute about the money, had not seen any of the allegedly threatening videos or messages, and had no way of knowing whether Gerriante, in fact, did possess a gun but had not told her about it. Thus, the admission of this testimony should not be considered harmless error, and Calvin is entitled to a new trial on this basis. Next, the court permitted lead detective Jody Cherry to sit at counsel table for the duration of trial and serve as a cleanup crew for the prosecution. Cherry was the final witness called in the state's case in chief, meaning that he heard the evidence of all of the other witnesses, which included nine adolescents, and was then positioned to fill in gaps and clear up ambiguities for the jury through his own testimony. This case did not have complicated or technical facts which the state's attorney would need assistance in presenting to the jury. Aside from claiming Cherry as its designated representative under Rule 615-2, the state provided no justification for Cherry's presence for the duration of trial. This practice is a departure from the long-standing routine of allowing motions to exclude. The state's representative is the state's attorney. The interests of fairness to both parties and the policy interest of conserving police resources do not support allowing a lead detective to take an additional role in a prosecution. A police officer is a figure of authority, and his testimony may be prejudicial if he informs the jury that they should believe the prosecution's case. In Calvin's case, Cherry did just that with respect to three different types of evidence, all of which went to Calvin's ultimate defense. First, no witness saw Jerry Ontay get shot, and the home surveillance cameras did not that he had never seen Jerry Ontay with a gun after viewing these videos multiple times. Cherry's words had the authority of law enforcement behind them, even though there was no way to know from the videos whether Jerry Ontay stood in front of the window with the form of a weapon visible, as Calvin testified and as Whitfield stated in his custodial interview. For the state, there was a frustrating absence of documentary evidence on this key moment, and Cherry was there to fill in the gap. Viewing the home surveillance videos makes it readily apparent that no witness interpretation was necessary. The videos were taken from a single camera positioned at a single angle with a view to an ordinary household kitchen, and little activity actually occurs within view of the camera, save for a few of the teenagers moving in and out of view. Cherry's testimony was not required to aid the jury in their understanding, and Cherry had no personal knowledge of the people or events depicted in the videos. Simply put, Cherry should not have narrated these videos, and his doing so contravened the rules of evidence and contributed to the prejudice resulting from his continual presence throughout Calvin's trial. Second, Cherry similarly functioned as the gap filler when he explicated the Facebook message exchange between Jerry Ontay and Calvin over Calvin's missing money. Here, Calvin was prejudiced because Cherry's testimony served to magnify this dispute in the minds of the jurors. And once again, Cherry's testimony was not supported by any established rule of evidence. Cherry was not qualified as an expert in adolescent social media slang, and nor was one necessary because the Facebook conversation was one the jury was fully capable of deciphering. Third, Cherry's cleanup crew came through again when he attempted to reconcile the inconsistencies in Whitfield Harris's testimony. Whitfield's in-court testimony contradicted that in his custodial statement on two key points, whether he could see someone in Jerry Ontay's house holding an object that looked like a gun and whether he heard return fire. Shortly after his arrest, Whitfield told Cherry that inside Jerry Ontay's house, he saw a long shadowy figure that looked like a gun. However, at Calvin's trial, Whitfield stated that he did recall telling the police this. Similarly, during his custodial interview, Whitfield told Cherry that after Calvin shot, they shot back. Whitfield said that people from Jerry Ontay's house ran outside after Calvin shot at the house, and they fired five or six times at him and Calvin as they ran away. Yet, at Calvin's trial, Whitfield stated that he was not sure if he had heard return fire. In his testimony, Cherry improperly attempted to rehabilitate Whitfield by presenting his own speculative account of what Whitfield was thinking at the time he gave the statement and why his answers at trial differed. In so doing, Cherry discredited the beneficial parts of Whitfield's account in the eyes of the jury and attempted to simplify and smooth over his contradictory narrative. These errors rendered Calvin's jury trial fundamentally unfair. The state was allowed to elevate Cherry throughout its prosecution, sitting him at council table where the jury and all of the teenage witnesses could see him and where he could listen to each witness's account and then fill in gaps during his own testimony. Calvin's trial was not helped by the ineffective assistance of defense counsel, who literally and figuratively fell asleep at counsel table. Counsel admitted that she nodded off during a portion of Calvin's trial, a fact that may have been as observable to the jury as it was to Calvin himself. Don't mean to stop you counsel, but if I'm recalling from my reading, there were two attorneys at defense counsel table, correct? Yes, you're right, your honor. Okay. Counsel also failed to zealously pursue Calvin's defense. Although counsel knew of a witness, James Mann, who had been interviewed by police and who said he heard at least two types of gunfire, counsel never sought to present him as a witness. This was despite the fact that the crux of Calvin's defense was that he believed someone in Geronti's house was going to shoot him and that he heard gunshots coming from Geronti's house after he fired. Similarly, counsel failed to introduce images of Geronti holding guns, which had been obtained in discovery and which the trial court had ruled would be admissible as impeachment evidence. After Paul Moore testified that Geronti did not have a gun, such evidence would have served both to discredit her and to provide direct support for Calvin's images at trial. Wasn't that somewhat of a trial strategy given the fact that the trial court said that if he wanted to use those photographs, then it would open the door for any photographs of your client holding guns to be admitted as well? Correct, your honor. That is what the trial court ruled. However, we would argue that those images would not have been so prejudicial as to warrant excluding similar images of the victim holding guns, simply because Calvin never denied that he had guns and the jury had already heard this testimony from Paul Moore about these, about guns that Calvin possessed. Yeah, but the fact of the matter is, and this is why I'm characterizing, isn't that a strategy decision that trial counsel made at the time and now in hindsight, obviously it may have been a bad decision, but do we correct that for them now? Well, your honor, I think that the evidence potentially went right to the heart of Calvin's defense and that he did not have, aside from his own testimony, direct evidence that Geronti did in fact own a gun. And showing these images would have provided evidence that went right to the heart of his defense. Just one more thought. Even prior to trial, defense counsel failed to protect Calvin's constitutional rights. Calvin's custodial statement should have been suppressed because he explicitly invoked his right to counsel during interrogation. Had defense counsel properly sought to suppress this statement, Calvin would not have faced the prejudice of his jury seeing him in an interrogation cell, struggling to focus due to the effect of a substance he had taken. Instead, he could have been able to provide his account to the jury, his credibility untarnished by this site. At every turn, Calvin's constitutional right to a fair trial was infringed by the court, the state, and defense counsel. Calvin requests that this court reverse his conviction and remand for a new trial or grant the alternative relief requested in his briefs. Thank you. Thank you, Ms. Cook. Before we move on to Mr. Finjack, Justice Vaughn or Justice Barberis, do you have any questions? No. The ineffectiveness of counsel claim is your allegation of error that the court failed to appoint new counsel for him or what's the basis of your error there? That's right, Your Honor. Our claim is being raised in the context of Calvin's pro se crankle motion and we're arguing that he met the standard of possible neglect warranting new counsel to investigate and hold an evidentiary hearing on these allegations. Is that the man testimony and the gun testimony Yes, you're right. Yes. The attorney falling asleep but you're not putting as much stock in that because as Justice Bowie pointed out there were two attorneys there and my memory is the attorney never really admitted she fell asleep. She said she'd closed her eyes but it was during the playing of a video so there was no one to cross-examine anyway. Is that right? Yes, that is what she stated. However, that was not Calvin's recollection of the timing of when she fell asleep um and in any case um this this is exactly the type of issue that um could be further developed um with the assistance of counsel at an evidentiary hearing. Well I'm certainly not condoning sleeping during trial but as Justice Bowie points out if there was another attorney there representing how was the defendant prejudiced or how was the defendant harmed if he had representation that was on the job at the wheel whatever you want to say his rights were being protected because there was at least one attorney there wide awake and paying attention. Yes, your honor but he had been appointed two attorneys because two were necessary in a murder trial such as this and the attorney who fell asleep was um taking more of the role of of lead counsel in this case um conducting more of the witness examinations and uh the closing argument and her her missing out on what could have been essential testimony was um certainly prejudicial to her ability to um resume his defense. But it wasn't really testimony it was the plane of a video so I mean there was no one to cross examine this presumably she'd seen the video before so I'm not sure how how that in and of itself rises to the level. Well your honor um Calvin testified that it didn't occur during recorded video it occurred during live testimony um and to my recollection the other attorney who was representing Calvin was not present during the preliminary inquiry into his um crankle motion and so he did not weigh in on when uh this sleeping might have occurred. All right thank you. Thank you Ms. Cook. Mr. Finjack go right ahead with your argument you're muted if you could unmute for us please. All right thank you your honor um first as respect to Paula Moore's testimony um uh she testified to the uh existence of a dispute between the defendant and the victim over the missing money but um we would argue that uh one of the one of the factors in a harmless analysis um is whether the the evidence was cumulative there was lots of evidence in this trial that there had been a dispute over the uh money um as far as um the uh her testimony that the defendant had or the the victim had told her the defendant had sent her that the victim had told Moore that the defendant had sent him threatening images um that's not what uh tipped the scales um as far as uh the defendant's conviction um the defendant was convicted based on overwhelming evidence primarily to do with fact that he sought out his former friend's house traveled to the house um lurked around in the back backyard and ended up firing multiple rounds into the house killing the victim as far as cherry's presence um the case law said that the the mere presence of a detective a law enforcement official throughout the trial is not in and of itself enough to um the defendant argues that his presence allowed him to shape his testimony um i don't think there's any evidence to support that as far as his testimony on the video he can find his testimony to what he observed he never said that the victim never had a gun period he said that in the video you can see that there's no gun um that appears in the victim's hand or um anywhere in the recording um and one of the the one of the factors in whether it's uh appropriate for a witness to narrate a video is whether it's thompson case and here it obviously was helpful um the jury doesn't have the luxury like the detective did or like we do grab the record to you know re-watch the video over and over again stop it you know closely look at what's occurring um so his narration uh serves to help the jury see what's happening um it you know in the whole point of him saying that you couldn't see a gun there i mean obviously that is circumstantial evidence that the victim was not armed at all and the jury could reasonably infer that um the jury could also infer that as the defendant has argued a gun is easy to hide the jury could say well he still could have had a gun in his waistband or whatnot the point is that it was a piece of evidence for the jury to um you know use in coming to their conclusion um so we do not believe that there's anything improper about that testimony um as far as his statement regarding uh Whitfield Harris um the defendant keeps keeps basically saying that he was testifying to his opinion of Harris's thought process which is simply not the case he testified to what Harris told him during their interview about what Harris's thought process was um the defendant's reply brief says that's a distinction without a difference but i we believe that's just flat wrong i mean uh the detective was testifying to a factual matter he wasn't theorizing about well Harris thought you know might have thought this and that's why he said that he thought he saw a gun initially uh he's saying that's what Harris told him uh so he wasn't offering his opinion on Harris's thought process uh as far as the um the ineffective assistance of counsel arguments the crankle arguments um that as um your your honor pointed out uh as far as the attorney falling asleep which is obviously inappropriate um he he still had the assistance of another attorney the attorney who presumably fell asleep uh testified or told the judge at the the post trial hearing that she fell asleep well uh during the the playing of uh the defendant's in the trial in a in a way that would have you know prejudiced the defendant conceivably prejudiced the defendant in any manner uh as far as the uh images not introducing images of the victim with guns that that was obviously a strategic decision to if she had introduced those images then the state would have introduced images of the defendant with guns now maybe the benefit of introducing images with the victim of guns would have outweighed the the damage to the defendant if the state had introduced the images but that the fact remains that was a strategic decision which is that a valid strategy decision though if as opposing counsel points out he admits he had a gun he admits he shot he's just claiming self-defense so if he's admitting he has a gun how is the fact that there may be pictures of him with a gun coming in defendant with a gun coming in how does that factor into a strategy decision well it depends on what the images show if they were seemingly threatening in nature um you know then it could have damaged the defendant the counsel made that decision um you know she felt that that was the correct decision to make and it was a strategic decision whether it was correct or not um as far as um the uh introducing james man's or attempting to introduce james man's testimony what man told the police did not comport with the defendant's own account of what had happened so counsel felt that that would not have been a smart decision to enter to attempt to introduce man's testimony again that was a strategic decision and as far as we talk about the sentencing for a minute that the judge incorrectly believed the defendant had a an adult criminal record when he did not he had a juvenile record but he had no adult criminal record at a minimum does the state concede this should be remanded for a new sentencing hearing because of that incorrect belief the state's position is that um the judge's incorrect belief that he had a prior prior adult conviction didn't factor in a significant manner in the uh basically focused on his extensive criminal record up to that as a whole up to that point and didn't didn't appear to place any particular weight on that uh the court stated at r1034 that the prior record was a significant aggravation right we're arguing that as a whole because he had several juvenile convictions as well and the the trial court also did talk at length about the defendant's youth as a mitigating factor so um if the the court had believed that he had this adult which apparently the court did believe he had an adult conviction but it would have obviously have been very close to when he had just become a legal adult and the court felt that his youth was a mitigating factor so the state argues that the court wouldn't have placed any particular emphasis on that adult conviction in its uh in its sentencing determination thank you you or fin jacket uh did you want to make a final statement thank you your honor um just a couple one second miss cook i'm sorry that's all right i know uh justice bond had a couple questions i just want to make sure mr fin jack was able to close his argument if he needed to um all i was gonna the last thing i was going to say about the crankle argument is uh the defendant argued that the counsel was uh ineffective because she didn't move to suppress his statement but the his statement to uh his custodial statement didn't differ in any significant way from what he testified to at trial so there would have it basically was a moot point there there was no reason to uh suppress the statement that um that that's all i wanted to add all right thank you mr fin jack now before we move on to miss cook just to be clear justice bond or justice barbarus do you have any final questions for mr fin jack i have no other questions i don't okay thank you now miss cook go right ahead thank you your honor um i'd like to address the issue of um war's testimony um being a harmless error because the evidence of the missing money what her testimony regarding the missing money was simply cumulative of other evidence i believe the prejudice that um is in in her testimony is because when when calvin testified about this dispute he emphasized that although the dispute occurred he held no grudge over it it was a minor thing um and he had moved on from it and um her testimony um served to contradict and discredit his and to establish for the jury what was a potential motive um for an attack um i would also like to turn to the issue about cherry's um mere presence not being prejudicial um one point i'd like to make is that a police officer is not like any other witness um in this case we had nine uh teenagers testifying his presence throughout the trial could have been intimidating to um any of those witnesses um in addition um the idea that his narration of the video was helpful to the jury because jury members are not able to re-watch the video i'm not sure that's the case um in this case there were seven 30 second video clips um and i believe they were sent back to the jury during their deliberation just like photos or any other exhibit um there's no reason to think that the jury would not have had time to re-watch the videos if they felt that would be helpful during their deliberation um the question about cherry's testimony regarding Whitfield's thought process um if in fact what cherry was saying was he was merely remarking about what Whitfield told him was his thought process um that is still an admissible hearsay um if it was important to state's case to uh to admit that portion of um Whitfield's custodial interrogation they simply could have played that uh clip from his own recorded interrogation rather than have cherry um provide this hearsay testimony about um what Whitfield told him he was thinking um next on the ineffective assistance of counsel argument um the issue of James Mann um counsel stated that his remarks to the police would not have comported with Calvin's account at this point we do not have a full account provided from James Mann we have merely a cursory statement in a police report it's difficult to know just based on that what his full story might have been but his account as relayed to the police was that he heard more than one type of gunfire which certainly would support Calvin's account of also hearing multiple gunshots return fire um after he fired um and finally the the argument that there was no reason to suppress his statement Calvin's statement went on for two hours and 44 minutes of the jury watching him in an interrogation cell um at the beginning of the um recorded statement it's clear that he's struggling to focus um he had the you know the detectives were asking him are you on some kind of drugs um it's clear that he is not at his best and um simply watching this statement certainly was prejudicial to his defense and that's all i have um your honors if there are any other questions i'm happy to answer them thank you miss cook uh justice barbarus or justice fond any final questions nothing nothing for me none well counsel thank you uh for your argument today obviously we will take the matter under advisement we will issue an order in due course